MILLER, Judge pro tern.
Chester Melder, Jr., a Correctional Officer I, and Murphy F. Whitmore, Prison Hospital Technician III, were discharged from their employment at Louisiana State Penitentiary by the Warden on June 23, 1961. The assigned cause for dismissal of each was “insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the operations of this institution,”. The specific acts of disloyalty and insubordination assigned by the Warden were the following:
“1. Shortly after the present board of institutions took office on or about July 25, 1960, there was circulated among some of the members of this board, namely; Mr. J. L. Walker, Mr. Chester Green and Mr. Leo L. Ebrhard an anonymous and unsigned document highly critical of the State Penitentiary at Angola and of the Warden and other personnel, a copy of which is annexed hereto and made a part hereof.
“2. This document was likewise circulated to other parties including some members of the Legislature.
“3. Following the circularization of this document, and to a large extent because of it, a subcommittee of the Board of Institutions composed of Messrs. E. A. Lee, Sr., E. C. Thompson, H. C. Peck, Albert P. Gallinghouse and Leo L. Ebrhardt conducted an investigation into the operations of the State Penitentiary, said investigation having commenced on the 3rd day of October, 1960, and having been completed on the 10th day of October 1960.
“4. Thereafter an investigation into the operations of the Penitentiary was likewise made by a special Committee appointed by the Governor composed of Messrs. J. C. Gilbert, Davis W. Folkes, Lantz Womack, T. J. Stro-ther, W. C. Steen, Jr., Marion Roy, James R. Leake, Walter P. Clark, and Frank J. Altmyer, which investigation commenced on the 15th day of March, 1961, and was concluded on or about the 23rd day of March, 1961.
“5. In both of the aforementioned investigations, it was admitted by you that you were a co-author of the document hereto attached, and responsible for its distribution.
“6. The writing and distribution of this unsigned anonymous document by you constituted the grossest type of insubordination, disloyalty and misconduct of such a nature as to be highly detrimental to the efficiency of the service.
“7. It is manifest from a reading of this document that its purpose was to disrupt the normal operations of the penitentiary and was motivated by the malicious intent on your part to bring about, if possible, radical changes in the personnel, policy and practices of the State Penitentiary more satisfactory and convenient to your purposes.
“8. The distribution of this document was made by you surreptitiously in complete disregard of normal administrative channels and processes available for the lodging and investigation of such complaints.
“9. Pretermitting the truth or falsity of the contents of said document, your action as aforesaid constitutes sufficient cause for your dismissal for the above stated grounds and reasons.”
*228 The document attached to the letter of dismissal was an unsigned, thirteen page report prepared by Murphy F. Whitmore and Chester M. Melder, Jr. during a two to three month period in the summer of 1959. Concerning the manner in which the information was developed for publication in the unsigned report, Whitmore testified on cross-examination and it was stipulated that Melder’s testimony would be the same, that:
“Q. But there is data contained in these documents which were based on information that you got from other people. Isn’t that correct, Mr. Whit-more?
“A. Yes!
“Q. Who were these other people? I am not asking you to identify them.
"A. They were employees of the Penitentiary.
“Q. They were employees of the Penitentiary ?
“A. Yes, sir.
“Q. How many other employees of the Penitentiary do you think were involved in helping you to concoct this document ?
“A. I would say between 25 and 30.
“Q. And they were connected with the various departments in the Penitentiary ?
“A. Yes, sir.
“Q. How long a period of time was it during which you were writing this document before you finished it, I understand, in 1959? Over what period of time did that authorship extend?
“A. I would say about two or three months.
“Q. You were careful not to call in the Warden at that time, weren’t you?
“A. Well, we didn’t see any reason to call him in.”
Their testimony together with a reading of the unsigned report clearly reveals that Whitmore and Melder contacted the other employees to elicit among other things, complaints and derogatory rumors concerning the operations of and conditions at the penitentiary, and numerous irrelevant and personal problems of many of the supervisory employees. As admitted by Messrs. Whitmore and Melder, the document contains scurrilous remarks about the Warden. Some of the more benign statements in the unsigned report are:
“GENERAL COMPLAINTS
“(1) We don’t have proper recreation activities for our children. The recreation we now have, most of the free people have to foot the bill for any type activities their children participate in.
“(2) The Tunica Elementary School needs a thorough shake-up. Most of the teachers there are employees wives here at Angola. The children start classes at nine (9) O’Clock in the morning and have three (3) recreation periods during the day and are home by two-thirty in the afternoon. This school is also operated on a Whos-Who basis. If your child is lucky enough to belong to the social class, he will always make good grades.
“(3) Our hunting and fishing is being ruined by too many people for too little game. On spending the opening day of a game season trying to hunt, we found that it was dangerous because of so many outsiders. The opening day of the Dove season last year resembled the charge of the Light Brigade.
“(4) Our fishing has been very nearly ruined by people with nets and every other type of thing you can dream of to catch fish with. There have been occasions where people have been stopped at the front gate with tubs, ice-boxes and buckets of fish. These *229 people do not live here, hut stay and visit for two or three days and fish night and day for fish for their deep-freezers. There are also hunters at night with spot lights.
“(5) We have no Game Warden supervision on Angola at all.
“(6) The Free People need a church. The ones we presently have are used by inmates and Free Personel (sic) both, at separate times.
“(7) A better highway from Angola to Saint Francisville.
“(8) A thorough and impartial investigation into our Civil Service program here at Angola.
“(9) A wage increase for under-paid employees, who, according to Civil Service rules, are due one.
“(10) Enforce tighter rules and regulations in all departments such as Per-sonel (sic) and Management.
“(11) Furnish Free Personel (sic) with better purchasing facilities, such as, larger varities (sic) of food products and a regular Country Style Drug Store.
“(12) There are at least then (10) cases where husband and wife are on the State payroll and have from two to five children who are left at home to fend for themselves while their parents are at work.
“(13) Everyone should be made to pay their grocery and telephone bills, not just the little employees.
“INMATES
“The inmate council sets up rules for the New Prison to be governed by.
“Money should be placed back into circulation among inmates and the coupon system taken out as the cost of printing those coupons is very great.
“The same Good Time System should be put into effect for Narcotics as offenders of other crimes.
“The Forgotten Man Committee is completely ridiculus (sic). It works the same as the Pardon Board. If you can raise the money, you go out, if you can’t, you stay.
“The Incentive Pay for inmates is being handled just about like the system for Free Personel (sic). Men in Technical jobs are unable to receive the maximum pay while inmates on yard jobs are receiving high pay scale.
“Out of Three Thousand (3,000) men, only eight hundred (800) are assigned to farm work. This is our major industry. Most of the others are lying around dormitories or other menial jobs.
“Many Free People would like to have the inmate guard system discontinued. These inmates have many privileges which other inmates do not enjoy, yet most of these people have committed crimes of Incest, Rape and Murder. These are the ones they let run loose and give shotguns to for guarding other prisoners.
******
“RECREATION NEEDS FOR FREE PERSONEL (sic)
“(1) Lights on ball field for little league ball club. The Warden says we have no money for this, but, convicts get any type equipment they need.
“(2) We used to have a dance every Saturday night. This has been discontinued because the wife of * * * does not believe in dancing.
“(3) We did have a place at Camp PI where you could go almost any time and get fishing worms. This was discontinued by * * *.
“(4) The people here on Angola are very displeased about other people, especially petty politicians, bringing *230 their friends and anyone else to hunt and fish on the farm. We believe the birds and fish should be left for our benefit and no one elses. Perhaps * * * could be of some help on this sub j ect.
* $ * * $ *
“COMMON TALK AND KNOWLEDGE
“ * * * is from Texas and only has seventh (7th) grade education.
“Mrs. * * * has been taken home from job because she was too drunk to work.
“ * * * is a heavy drinker.
“ * * * runs Negro Bar and Honky Tonic after working hours here at Angola. His wife was caught last year in bed with an inmate. The inmate, * * * was busted from inmate guard to trusty.
“ * * * is an alcoholic. He and his wife have family fights and she turns up with black eyes now and then.
“The Record Office has released people on parole who were not due to go.
“An inmate who escaped recently is now in Charity Hospital, New Orleans, because of a beating with a rubber hose he received in the Cell Block after his capture. He was beaten and placed in solitary confinement for nine (9) days. When he came to' the hospital, he was rushed to Charity and found to have a ruptured ulcer and peritonitis.
“ * * * — Secretary for * * * is a member of the clique. Unable to take shorthand and doesn’t have required typing speed.
* * * * * *
“The Business Manager does not know his job. He is dependent on convict women.
“The Assistant Business Manager is a severe alcoholic and has been arrested for drunk driving a dozen times and each time the charge was fixed by * * *_
“ * * * and * * * were appointed by the Warden because their fathers are members of the cliques. They are being paid $1.00 per hour. More than most Free Employees are making and this is for nine (9) hour days during the summer months.
“We are supposed to be on a forty (40) hour week, but, some of the Free Personel (sic) are required to work ten (10) to fourteen (14) hours a day with no compensatory time or time off. Every year the payroll department cuts much of our compensatory time and annual leave time because you have accumulated too much. Should you ask for this time that you have earned off, you can’t get it. Only certain people are allowed time off.
“CONCLUSION
“The people of this Penitentiary request a fair and just investigation into this situation by the Governor and the Institutions Investigating Committee.
“SUGGESTIONS
“Do not go on a guided tour by the Warden which is the usual technique.
“Committee should meet in a room with none of the Pentientiary Officials present and call Free Personel (sic) at random for talk and questions and perhaps some of these things may come to light.”
Notwithstanding the admission by Whit-more and Melder on cross-examination that the report contained “scurrilous remarks about the Warden”, they testified concerning the Warden that “I still think he is a good man.” [1]
*231 Although the Warden knew of the existence of the report as early as October of 1960, he did not know who authored the report until June 22, 1961, the day before he discharged Messrs. Whitmore and Mel-der.
Whitmore and Melder did not attempt to bring the contents of this report or any of the complaints therein contained to the attention of the Warden or any of the supervisory personnel at the Louisiana State Penitentiary. While both deny that they surreptitiously distributed copies of the unsigned report, the fact is that they admit that they distributed it privately to two appointees to and one member of the Board of Institutions, which Board is charged with the responsibility of supervising the operations of the Louisiana State Penitentiary, and to two legislators. The record shows that the unsigned report was also transmitted by mail from a third party to the Chairman of the Board of Institutions. They further admit that they did not give a copy of the report to the Warden or to any of their supervisors at the Louisiana State Penitentiary and that they did not follow the prescribed procedure for filing complaints.
As noted in paragraphs numbered 3 and 4 of the letters of dismissal, there were two investigations of the operations of the State Penitentiary following the private circulation of the Whitmore and Melder unsigned report. One was conducted by a subcommittee of the Board of Institutions from October 3, 1960 to October 10, 1960 and one by a special committee appointed by the Governor which commenced on March IS, 1961 and concluded on March 23rd, 1961. The result of these investigations was that the Warden was retained and on June 22, 1961, the following resolution was unanimously adopted by the Louisiana Board of Institutions:
‘WHEREAS, an investigation of the operations of the State Penitentiary at Angola was conducted by a subcommittee of this Board during the month of October, 1960, and
“WHEREAS, a further investigation of the operations of the State Penitentiary was made by a Committee appointed by the Governor during the month of March, 1961, and
“WHEREAS, a transcript of the proceedings of these two investigations has been completed, and reports with respect thereto have been made by the respective committees, and the information therein contained reveals that disciplinary action should be taken against certain employees of the Penitentiary for acts of insubordination and disloyalty that in the opinion of this Board will warrant the termination of these employees, and,
“WHEREAS, there has not previously been forwarded to the Warden of the State Penitentiary a transcript of these proceedings, or copies of the reports with respect thereto, and,
“WHEREAS, copies of these proceedings and the recommendations, with respect thereto should be made available to the Warden of the State Penitentiary for his study, recommendations and action.
“NOW, THEREFORE, Be It Resolved that the Director of Institutions be and he is hereby instructed to transmit to the Warden of the State Penitentiary a certified copy of this resolution and transcripts of the two investigations hereinabove referred to and that he instruct the said Warden to immediately study and analyze the said transcripts and that the Warden take such disciplinary action by termination of employment or otherwise in the best interest of the institution and in accordance with the rules and regulations of the Louisiana Civil Service Commission.”
The next day, June 23, 1961, the Warden discharged Messrs. Whitmore and Melder.
The appellants appealed their discharge to the Civil Service Commission where the *232 matter was heard on August 9, 1961 and the Commission, on September 29, 1961, dismissed both appeals with two members dissenting, whereupon appeals were perfected to this court.
The law is well settled that where a decision of the Civil Service Commission is based on evidence it is not the province of the court on appeal to determine the weight or sufficiency of the evidence, as this is a question of fact which the Commission has the exclusive right to determine. King v. Department of Public Safety, 236 La. 602, 108 So.2d 524; Cottingham v. Department of Revenue, 232 La. 546, 94 So.2d 662; Leggett v. Northwestern State College, La.App., 132 So.2d 715.
The sole question before this court is whether or not there was any evidence before the Civil Service Commission sustaining the general charge of insubordination and disloyalty of such a nature as to be disruptive, highly demoralizing and detrimental to the operation of the Penitentiary. We take particular note of the fact that the truth or falsity of the contents of the unsigned document which served as a basis for appellants dismissal was specifically eliminated as a cause of their discharge in the letter of discharge and in the trial before the Civil Service Commission.
It is made clear by the record that there are two means by which appellants could have properly made and aired their complaints. One was prescribed by the Louisiana State Penitentiary and one by the Board of Institutions. Appellants admit that they did not attempt to use either of these methods. As to the procedure for bringing complaints before the Board of Institutions, the evidence does not conclusively show that the appellants were properly notified of the existence of this procedure. However, the record is clear that appellants did know the proper procedure for filing complaints before the Grievance Committee at the Louisiana State Penitentiary. In explanation of their failure to use this procedure they testified that:
“A. We (previously) filed two grievances that I am familiar with to the Penitentiary Grievance Committee. One was for repairing the guard screens, screens on guard towers, and the other was a request by some of the personnel to purchase an Army surplus hot food serving apparatus to be carried around when there was a chase so that some of these men could be served hot drinks and some hot food while they were on guard duty and on a chase.
“Q. Did you call any of these other facts or things to the attention of Mr. Ruff or the Warden or both?
“A. We went to Mr. Walker first and the grievances were folded and thrown back across the desk. We took these grievances to the grievance committee in written form and properly presented.
“Q. And you say it was thrown back across the desk and what?
“A. And we were told to take them, and I couldn’t say it in the presence of my wife and another lady, and after this we came through Baton Rouge and talked to Mr. Ruff.”
The Warden testified that Messrs. Whit-more and Melder did not make any complaint to him and appellant’s counsel brought out that when the Grievance Committee procedure is followed there is no way for the Warden to know who made the complaints.
It is noteworthy that in all the scurrilous and irrelevant remarks concerning the Warden and supervisory staff at the Penitentiary contained in the unsigned report, no mention was made of the Warden having been discourteous to either Whitmore and Mel-der, nor does the unsigned report contain any complaint that there is no adequate means for airing complaints or for filing grievances. The unsigned report does not *233 complain about the prescribed procedure provided for filing grievances. Appellants simply elected to disregard this procedure.
The dissenting opinions filed by Judges Rivet and Dennery of the Civil Service Commission stress two points as we understand their opinions. (1) They find no cause for the dismissal of these two Civil Service Employees, and (2) the freedom of speech provisions of our Constitution assures these employees the privilege of preparing and circulating the unsigned report. In this connection, emphasis is placed on the fact that the truth or falsity of the contents of the unsigned report was specifically removed as an issue. From this we gather that there is a belief that all or a substantial part of the contents of the report may be true, and if in fact they are true, then appellants had every right to resort to the methods used by them to make their private investigations and to make known the rumors and complaints by circulating their unsigned report.
Concerning the truth or falsity of the information contained in the unsigned report, we think it appropriate to note that Whit-more and Melder admitted that the report contained scurrilous remarks about the Warden, yet state that they believe that the Warden is a good man. Innumerable items in the unsigned report by innuendo insinuate that the Warden should do something about situations that are completely without the scope of his authority. As examples we cite the complaints that a new road is needed to Angola, narcotic violators should have the same parole privileges granted other violators, the Free People need a separate church, the Forgotten Man Committee is completely ridiculous. The manner in which this unsigned report was prepared and distributed and the contents thereof show to our satisfaction that these employees were insubordinate and disloyal to the supervisory employees.
The cause for dismissal clearly and succinctly stated in the letters of discharge quoted at the beginning of this opinion, was proved. The writing and distribution of the unsigned report which was made a part of the letters of discharge, constituted the grossest type of insubordination, disloyalty and misconduct and was, in our opinion, of such a nature as to be highly detrimental to the efficiency of the service. To hold that these employees can disregard the prescribed methods for making complaints and contact 25 to 30 co-employees for the express purpose of obtaining complaints and rank hearsay rumors concerning the operations of the Penitentiary and the personal lives of ifehose charged with the security of the Louisiana State Penitentiary, for the purpose of distributing an unsigned report setting forth these attacks would encourage a complete breakdown in the chain of command, the integrity of which is absolutely essential in the operation of a penitentiary. The contents of the unsigned report, the manner in which it was prepared and distributed is proof that these employees intended to disrupt the normal operations of the penitentiary and were motivated by the malicious intent to bring about, if possible, radical changes in the personnel, policy and practices of the State Penitentiary more satisfactory and convenient to their purposes.
Here the issue is not freedom of speech, but resolves itself into the question of whether or not the preparation and dissemination of this scurrilous unsigned report by employees who knew of but refused to use the grievance procedures can be condoned. To approve their actions would in our opinion disrupt the loyalty, cooperation and confidence of the employees which is manifestly essential to operate a penitentiary.
For these reasons, we affirm the decision of the Civil Service Commission, costs to be paid by appellants.
Affirmed.

. Whitmore so testified and it was stipulated that Melder’s testimony would be the same.